Filed 1/2/24  P. v. Williams CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | H050558 |
| Plaintiff and Respondent, | (Monterey County Super. Ct. No. SS042333A) |
| v. | |
| TRAVIS DANTE WILLIAMS, | |
| Defendant and Appellant. | |

In 2005, defendant Travis Dante Williams pleaded no contest to attempted murder (Pen. Code, §§ 664, 187, subd. (a))[1] and admitted a gang enhancement (§ 186.22, subd. (b)(1)) and firearm enhancement (§ 12022.53, subd. (c)) in exchange for a sentence of 29 years in prison.  In 2022, Williams filed a petition to vacate his conviction under section 1172.6.[2]  Following an evidentiary hearing, the trial court denied his petition. On appeal, Williams argues that substantial evidence does not support the trial court's finding that he aided and abetted the actual shooter with the intent to kill.  We agree and reverse the order denying his petition for resentencing.

---

[1] Unspecified statutory references are to the Penal Code.

[2] Williams's petition was filed under former section 1170.95, which has since been renumbered to section 1172.6.  (Stats. 2022, ch. 58, § 10, eff. June 30, 2022.)  We refer to the current version of the statute for clarity.

# I.   BACKGROUND

## A.   *The Plea and Sentencing*

In November 2005, Williams pleaded nolo contendere to attempted murder (§§ 664, 187, subd. (a); count 1) pursuant to *People v. West* (1970) 3 Cal.3d 595 (*West*) and admitted both a gang enhancement (§ 186.22, subd. (b)(1)) and a firearm enhancement (§ 12022.53, subd. (c)).  Pursuant to the plea agreement, the information was amended to reflect that the attempted murder was not "premeditated or deliberate murder" and the maximum sentence was 29 years in prison.

In the plea colloquy, defense counsel stated the following as the factual basis for the plea:  "Mr. Williams was in a vehicle driving at a time when Mr. Porter discharged a firearm at a house in which three women who had previously been on the porch ran inside, slamming the door before the bullets went through the door."  Although counsel reiterated that the plea was nonetheless a *West* plea, the trial court asked Williams if he "agree[d] that's what happened."  Williams responded, "Yeah."

Two months later, the trial court sentenced Williams to 29 years in prison—nine years for the attempted murder and an additional 20 years for the firearm enhancement— and stayed the sentence for the gang enhancement, as Williams was not the actual shooter.  (§ 12022.53, subd. (e)(2).)  Pursuant to *People v. Wende* (1979) 25 Cal.3d 436, we independently reviewed the record in Williams's case and affirmed his conviction in *People v. Williams* (March 27, 2007, H029992) [nonpub. opn.], finding no arguable issues.

## B.   *The Petition for Resentencing*

In February 2022, Williams filed a petition to vacate his conviction under section 1172.6, alleging that he could not be convicted of attempted murder under current law, given recent amendments eliminating the natural and probable consequences theory of liability for attempted murder (see § 188).  The prosecution opposed the petition, arguing that the facts supported premeditated attempted murder and that Williams was

2

ineligible for relief as he had the specific intent to kill but conceding that Williams was entitled to an evidentiary hearing.

## C. *Evidence Presented at the Hearing*

### 1. *The Offense*

The funeral of Albert Johnson, killed in Seaside, was on March 26, 2004. Earlier that day, Seaside Police had received an anonymous tip that there would be retaliation for Johnson's murder, for which a man named Deshawn Lee had been arrested, though he was ultimately not charged.

The night of the funeral at around 11:00 p.m., an officer was parked in a vacant lot near the intersection of Broadway Avenue and Fremont Street when she heard six gunshots. She drove toward Fremont Street and saw a black car coming from the west— the car appeared to skid through the intersection. The car had two passengers who were "looking around like they didn't know where they were." The brakes on the car appeared to "lock up" as the car stopped at every intersection whether or not there was a stop sign.

The officer was advised by dispatch that a black car had been involved in a drive-by shooting. While the car was in motion, the passenger leaned his head and torso out of the car. The car did not yield to the officer's lights and siren, and it eventually swerved across railroad tracks and crashed off-road near a tree stump. Both the driver and passenger crawled out of the car windows and ran but were eventually caught and arrested.

A .22-caliber Ruger firearm (type unspecified) was recovered in the bushes that the vehicle had swerved into. Williams was identified as the driver, and Anthony Porter was identified as the passenger. Williams was found with .22-caliber ammunition in his pocket. The prosecution admitted no forensic evidence comparing the ammunition in Williams's pocket to the rounds fired at the house; Williams was later recorded telling an associate, "[T]hey found me with some . . . twenty-two bullets in my pocket, but not the

3

ones that was used." There was vomit on the outside of the passenger side door, and officers could smell alcohol on Porter's person.

Officers saw that bullets (caliber and type unspecified) had been fired into the front of the house that was shot at, shattering one of the front windows and hitting the stucco near the front door. No testimony was presented about the number or whereabouts of any of the victims, or whether the house was otherwise occupied at the time.

### 2. *The Recorded Jail Call*

During the evidentiary hearing, a recorded jail call between Williams and William Pree, the registered owner of the car used during the shooting, was played for the trial court's consideration and admitted into evidence. In the call, Williams told Pree that Porter had been "too faded" to tell him which way to go. Williams also complained that he was now "[l]ocked up" for "two attempted murders." When asked by Pree what he did and whether anybody was "hit," Williams answered, "Nah! That stupid ass [n—a] didn't hit nothin' but the house." Williams also said, "[N]one of the case is mine," because "I ain't do nothin' but wheelin[']."

Williams told Pree that "[i]nstead of this dumb ass [n—a] gettin' out the car . . . [¶] . . . [¶] . . . runnin' by[,] dumpin' on the house, and then hittin' the corner and bouncin' in and us scuttin,' " Porter had wanted to "sit inside the car and sit . . . [¶] . . . [¶] . . . out the window and dump. You feel me? While the car ridin' by. You feel what I'm sayin'? And yellin' 'KAP' whoo . . . ."[3] Williams described Porter's chosen approach as "stupid as fuck" because all the police had to do was get a description of the car to catch them.[4]

---

[3] Former Seaside Police Officer Judy Straden testified that she later learned that "KAP" stood for "[K]razy Ass Pimps," a smaller gang.

[4] Straden, testifying as a lay witness, opined that Williams was suggesting to Pree that a better way to commit the drive-by shooting would have been for the shooter to get

Williams then mentioned that he was from Richmond and that Porter "ain[']t like us man" because "[t]hese [n—as] don't get down like we get down." Williams said, "Cuz we smarter than that. [N—as] know to bounce out the car and dump on the . . . mother fuckers . . . whoo, whoo, bounce . . ." Williams continued, "You feel me? These [n—as] don't do it like . . . See they ain't used to hard hittin' funk like we is man." Williams also made a reference to "Project Crip," which Straden described as a gang in Seaside.[5]

**D.      *The Arguments and the Trial Court's Decision***

The prosecutor agreed that Williams was the driver and not the actual shooter, framing the question as whether Williams was a major participant in a retaliatory drive-by shooting and whether he acted with the requisite implied malice. The prosecutor argued in the alternative that Williams could be liable as a direct aider and abettor acting with the intent to kill.

Defense counsel countered that the attempted murder count named Kimberly Lee-Roman as the victim, but that there was no evidence that Lee-Roman "had anything to do with any [retaliatory] motivation on the part of [Williams] or his co-defendant." To the extent the prosecution could once have relied on the kill zone theory or the natural probable consequences theory to obtain a conviction for attempted murder, the defense argued the kill zone theory had since been significantly modified by the California Supreme Court in *People v. Canizales* (2019) 7 Cal.5th 591 (*Canizales*) and noted the natural and probable consequences theory was now invalid. Defense counsel further asserted that "[a]ll this stuff about major participant is more attached to a murder, not an attempted murder."

_____

out of the car, fire the weapon, and then meet the car down the block, preventing the car from being identified.

[5] Straden surmised that Project Crip would have been "opposed to Albert Johnson and his friends" because Johnson was a "[B]lood."

In rebuttal, the prosecutor continued to dispute the necessity of proving express malice: "I don't know that we need to prove specific intent to kill." But the prosecutor further argued that there was "ample evidence of intent to kill," as Porter shot at several individuals. The prosecutor characterized Williams as having complained in the jail call that no one was actually shot.

The trial court denied the resentencing petition, concluding that Williams, "with the intent to kill, aided, abetted, counselled, solicited, assisted the actual killer in the commission of the crime and was a major participant in the underlying felony, and acted with reckless indifference to human life."

## II.    DISCUSSION

Williams argues that the trial court erred by denying his petition in that there was insufficient evidence that he aided and abetted the attempted murder with the intent to kill. Williams posits that he could have been convicted under a natural and probable consequences theory—for example, that his intent was to assist in the target offense of shooting at a house, the natural and probable consequence of which was that the shooting "may lead to an attempted murder." (See *People v. Montes* (2021) 71 Cal.App.5th 1001, 1007−1008.) As we will explain, we conclude that the record from the evidentiary hearing on the petition for resentencing contains insufficient evidence that Williams himself harbored an intent to kill, and we must therefore reverse the trial court's denial of his section 1172.6 petition.

### A.    *General Legal Principles and Standard of Review*

Senate Bill No. 1437 (Reg. Sess. 2017-2018) amended the Penal Code "as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § l, subd. (f); § 189, subd. (e)(3).)

6

Senate Bill No. 1437 also added former section 1170.95, under which a person previously convicted of felony murder or murder under the natural and probable consequences doctrine can petition for relief under the new law. Upon "a prima facie showing of entitlement to relief under [former] section 1170.95, subdivision (a), the petitioner is entitled to receive 'a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the petitioner on any remaining counts in the same manner as if the petitioner had not been previously . . . sentenced.' " (*People v. Sanchez* (2020) 48 Cal.App.5th 914, 917.)

At this hearing, "the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is guilty of murder or attempted murder under California law as amended . . . . If the prosecution fails to sustain its burden of proof, the prior conviction, and any allegations and enhancements attached to the conviction, shall be vacated and the petitioner shall be resentenced on the remaining charges." (§ 1172.6, subd. (d)(3).) At the hearing, the trial court may rely on "evidence previously admitted at any prior hearing or trial that is admissible under current law, including witness testimony, stipulated evidence, and matters judicially noticed. The court may also consider the procedural history of the case recited in any prior appellate opinion." (*Ibid.*)

We review for substantial evidence the trial court's factual findings after an evidentiary hearing held pursuant to section 1172.6, and we review the trial court's application of the facts to the statute de novo. (*People v. Cooper* (2022) 77 Cal.App.5th 393, 412; *People v. Oliver* (2023) 90 Cal.App.5th 466, 479–480 (*Oliver*).) When reviewing the trial court's findings for substantial evidence, we must " ' " 'examine the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value that would support a rational trier of fact in finding [the necessary fact] beyond a reasonable doubt.' " ' " (*Oliver*, *supra*, at p. 480.)

7

**B.** *Factual Basis for Plea*

Preliminarily, we must decide whether the factual basis for Williams's plea was properly considered at the section 1172.6 hearing as an admission. Defense counsel stated the factual basis in connection with a plea explicitly designated as pursuant to *West*, *supra*, 3 Cal.3d 595, though when asked if he agreed to the factual basis, Williams responded that he did. We agree with the parties that despite Williams's brief assent to the summarized factual basis, the trial court, and we as well, may not consider these facts when determining whether the prosecutor met his burden to demonstrate Williams is guilty of murder or attempted murder under current law as required under section 1172.6, subdivision (d)(3).

A *West* plea is indistinguishable from an *Alford* plea, which pursuant to *North Carolina v. Alford* (1970) 400 U.S. 25, 37–38, "allows a defendant to plead guilty [or no contest] in order to take advantage of a plea bargain while still asserting his or her innocence." (*People v. Rauen* (2011) 201 Cal.App.4th 421, 424 [asserting that a *West* plea is "also referred to as an *Alford* plea"]; *In re Alvernaz* (1992) 2 Cal.4th 924, 932 (*Alvernaz*) [*West* plea is "a plea of nolo contendere, not admitting a factual basis for the plea"].) Based on the change of plea form and his counsel's statements during sentencing, we understand that Williams in this case intended to maintain his innocence and not admit to a factual basis. (See *Alvernaz*, *supra*, at p. 932.)

We therefore conclude that Williams's *West* plea forecloses consideration of the factual basis set forth by defense counsel. After all, the purpose behind a *West*/*Alford* plea is to plainly *not* admit a factual basis for the plea. (*Alvernaz*, *supra*, 2 Cal.4th at p. 932.) Thus, Williams's plea of guilty " ' "admits every element of the crime charged . . . ," ' but no more." (*People v. Saez* (2015) 237 Cal.App.4th 1177, 1206; see also *Descamps v. U.S.* (2013) 570 U.S. 254, 270 ["when a defendant pleads guilty to a crime, he waives his right to a jury determination of only that offense's elements;

8

whatever he says, or fails to say, about superfluous facts cannot license a later sentencing court to impose extra punishment."].)

## C.     *Felony-Murder is Inapplicable to Attempted Murder*

Next, we observe that it appears that the trial court, when denying Williams's petition, erroneously relied in part on a felony-murder theory.  The felony-murder rule, described in section 189, subdivision (e) states in pertinent part:  "A participant in the perpetration or attempted perpetration of a felony listed in subdivision (a) in which a death occurs is liable for murder only if one of the following is proven:  [¶] . . . [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2."  The felony-murder rule, however, is inapplicable by its plain terms to an attempted murder, as well as aiding and abetting an attempted murder, because the felony-murder rule applies only when "a death occurs" (§ 189, subd. (e))—in other words, there must be a killing.  (*In re Lucero* (2011) 200 Cal.App.4th 38, 51.)  Thus, as the Attorney General concedes, the trial court's finding that Williams was a "major participant" and "acted with reckless indifference to human life" is not a basis to sustain his conviction for attempted murder.

## D.     *The Resentencing Record Lacks Substantial Evidence of an Intent to Kill*

The trial court, however, alternatively found that Williams acted with the specific intent to kill and aided and abetted the commission of attempted murder—in other words, that he was guilty of attempted murder as a direct aider and abettor.

"To prove the crime of attempted murder, the prosecution must establish 'the specific intent to kill and the commission of a direct but ineffectual act toward accomplishing the intended killing.' "  (*Canizales*, *supra*, 7 Cal.5th at p. 602.)  "To be guilty of a crime as an aider and abettor, a person must 'aid[] the [direct] perpetrator by acts or encourage[] him [or her] by words or gestures.' "  (*People v. Lee* (2003) 31 Cal.4th 613, 623, superseded by statute on other grounds as stated in *People v. Rodriguez* (2022) 75 Cal.App.5th 816, 823.)  And the aider and abettor "must give such aid or

encouragement 'with knowledge of the criminal purpose of the [direct] perpetrator *and* with an intent or purpose either of committing, or of encouraging or facilitating commission of,' the crime in question." (*Lee*, *supra*, at p. 624.) When the crime is a specific intent crime—such as attempted murder—the aider and abettor must share the same specific intent as the direct perpetrator. (*Ibid.*) "Thus, to be guilty of attempted murder as an aider and abettor, a person must give aid or encouragement with knowledge of the direct perpetrator's intent to kill and with the purpose of facilitating the direct perpetrator's accomplishment of the intended killing—which means that the person guilty of attempted murder as an aider and abettor must intend to kill." (*Ibid.*)[6]

With respect to Williams's intent, "intent to kill often must be inferred from circumstantial evidence surrounding the crime." (*Canizales*, *supra*, 7 Cal.5th at p. 606.) Intent to kill " 'may . . . be inferred from the defendant's acts and the circumstances of the crime.' " (*People v. Avila* (2009) 46 Cal.4th 680, 701.) In this case, although we conclude that the prosecution presented evidence at the hearing sufficient to establish that Williams intended to assist Porter with the shooting, the prosecution did not present evidence to support an inference that any person was an intended victim.

Williams was not the shooter, but he was found with ammunition of the same caliber that was used in the shooting. And after Porter fired the shots, Williams drove them both away, evading police, crashing the car, and eventually fleeing on foot. These circumstances demonstrate a consciousness of guilt and an intent to aid Porter in shooting at the house, but significantly, the prosecution presented no evidence at the hearing that the house was occupied.

---

[6] In contrast, under the natural and probable consequences doctrine, the specific intent to kill harbored by the actual perpetrator may be imputed to the aider and abettor; thus, section 1172.6 "applies by its terms . . . to attempted murders based on the natural and probable consequences doctrine." (*People v. Coley* (2022) 77 Cal.App.5th 539, 548.)

10

The recorded jail call does not fill the evidentiary gap. The Attorney General relies principally on Williams's statement, "That stupid ass [n—a] didn't hit nothin' but the house." Characterizing this comment as Williams "complain[ing] that Porter did not accomplish what they set out to do—that is, kill," the Attorney General disregards the context of Williams's comments. Williams first complained to Pree that Porter "was too faded to tell me which way to go" after the shooting. Then, after Williams protested that "they're gonna give me life," Pree asked, "[D]id y['all] hit anybody?" It was then that Williams said Porter hit nothing but the house. Considered in context, Williams's statement is equally consistent with an expression of frustration about Porter's drunkenness, to the extent it hindered their getaway, and about his charges being disproportionate to his offense. Williams's statement does not support a determination beyond a reasonable doubt that *he* actually "set out to . . . kill," as the Attorney General asserts, and was complaining that Porter failed to do so.

To be sure, Williams expresses no remorse, shock, or horror at Porter's actions during the call with Pree. Rather, Williams later expressed derision at Porter's approach to the shooting, noting that a better way to commit a drive-by shooting would have required Porter to leave the car, fire, and then rejoin the car at another designated location, minimizing the likelihood that the car itself would be identified. Williams's professed expertise in drive-by shootings makes clear that he considered himself the more sophisticated and practiced criminal of the pair. But speculation as to how Williams had become "used to hard hittin' funk" does not permit an inference of specific intent and conduct on this occasion conforming to this admitted criminal propensity. (See Evid. Code, § 1101, subd. (a).) Even assuming Porter's intent when shooting was specifically to kill rather than intimidate, what is lacking from the recorded call is anything from which the trial court could legitimately infer that Williams *shared* that same intent at the time.

11

The prosecutor in his closing argument argued that the drive-by was in retaliation for Albert Johnson's murder. If true, this would support an inference of a shared intent to kill, but there had been no evidence presented that the targeted house was associated with Deshawn Lee, the man who had been arrested in connection with Johnson's death. One might speculate that the named victim in this case—Kimberly Lee-Roman—was related to Deshawn Lee given the similarity of their respective surnames, but " 'speculation is not evidence, less still substantial evidence.' " (*People v. Waidla* (2000) 22 Cal.4th 690, 735.)[7] And though Williams, as part of his plea, admitted the gang enhancement in this case, the fact that the crime was committed in association with a gang does not establish that it was committed with the intent to kill.

We likewise also agree with Williams that there is insufficient evidence to support a conviction of attempted murder under the kill zone theory, a specific theory for establishing the specific intent to kill for a conviction for attempted murder.[8] In

---

[7] The Attorney General also claims that Williams told Pree that he regretted not advising Porter to wait until morning, evincing Williams's intent to kill—"presumably because better lighting would have improved their odds of actually striking a target." But this presumption, as the Attorney General correctly labels it, is not grounded in evidence. The Attorney General here again misreads Williams's statements: what Williams in fact told Pree was that Williams "woulda told" Porter to " 'wait till the mornin,' " and "I'd a been like wait till the mornin' man, cuz I . . . Man, cuz I kinda felt that I was gonna get me some pussy that night." Williams's conditional "woulda"/"I'd a" phrasing communicated that in hindsight—had he known Porter's intentions—he would have advised Porter to wait until morning so that Porter's plans would not interfere with Williams's own. Nowhere does Williams indicate that he had actually considered so advising Porter before the shooting to further their plans and regretted not having acted on that thought. The relative indifference with which Williams suggested he would have received Pree's disclosure of his plans is legitimately cause for concern, but the evidence of Williams's actual words is at odds with the Attorney General's argument.

[8] The Attorney General argues that Williams cannot rely on changes to the kill zone theory under *Canizales* to collaterally attack his conviction under section 1172.6. This misses the point of Williams's argument, which is not that he is entitled to reversal of his conviction under *Canizales*; instead, Williams is arguing that the prosecutor did not meet his burden of proof beyond a reasonable doubt that Williams is guilty of murder

12

*Canizales*, the California Supreme Court specified that the kill zone theory is applicable in certain situations; specifically, only those cases where a jury concludes: "(1) the circumstances of the defendant's attack on a primary target, including the type and extent of force the defendant used, are such that the only reasonable inference is that the defendant intended to create a zone of fatal harm—that is, an area in which the defendant intended to kill everyone present to ensure the primary target's death—around the primary target and (2) the alleged attempted murder victim who was not the primary target was located within that zone of harm. Taken together, such evidence will support a finding that the defendant harbored the requisite specific intent to kill both the primary target and everyone within the zone of fatal harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

There is scant evidence about the intended target or even about the scene of the crime that would support a finding of intent to kill under a kill zone theory. We acknowledge that the stated factual basis for the plea included additional information about the circumstances of the crime—that there were three women on the porch who retreated into the house, slamming the door before bullets hit the door. Yet, as we have explained, Williams's *West* plea precludes treating his assent to those facts as more than a stipulation to a factual basis for his plea. (See, e.g., *People v. French* (2008) 43 Cal.4th 36, 52 [rejecting Attorney General's contention that a defendant's stipulation to a factual basis constitutes a binding admission for all purposes].) This crucial evidence is lacking from the resentencing record because at the evidentiary hearing, the prosecution did not produce any evidence about the whereabouts of any of the victims when the shooting occurred. The only evidence is that gunshots were fired and that bullets hit the front of the house. There is no evidence from which the trial court could have inferred that "the

_____

under current law, in part because there is insufficient evidence to support a finding of intent to kill under a valid kill zone theory.

13

only reasonable inference is that [Porter] intended to create a zone of fatal harm" when he fired the shots, or that any of the victims were "located within that zone of harm." (*Canizales*, *supra*, 7 Cal.5th at p. 607.)

In coming to our conclusion that insufficient evidence supports a finding of an intent to kill under the kill zone theory, we acknowledge that the kill zone theory is but one basis for finding an intent to kill in an attempted murder case. The California Supreme Court in *Canizales* narrowed the kill zone theory but also noted that "there are evidentiary bases, other than the kill zone theory, on which a fact finder can infer an intent to kill for purposes of attempted murder liability that do not depend on a showing that the defendant had a primary target." (*Canizales*, *supra*, 7 Cal.5th at p. 608.) In fact, the *Canizales* court pointed to two specific cases as illustrative of this point (*id.* at pp. 608–609): (1) *People v. Stone* (2009) 46 Cal.4th 131, which held that a defendant who fires upon a group of people intending to kill someone, not knowing or caring who he or she actually kills, can be convicted of attempted murder because there is no requirement of finding a specific target (*id.* at pp. 139–140); and (2) *People v. Smith* (2005) 37 Cal.4th 733, which held that "evidence that [the] defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both" (*id.* at p. 743).

But as with the kill zone theory, there is insufficient evidence of any of these alternative bases to find an intent to kill because there was no admissible evidence about *where* the victims were when the shots were fired. There was no evidence that Porter fired toward the victims as opposed to toward the house, or that that the bullets hit areas close to where the victims were sheltered.

On appeal, we are mindful that we must defer to the trial court's factual findings and any logical inferences that might have been drawn from the circumstantial evidence. (See *People v. Maury* (2003) 30 Cal.4th 342, 396.) But an inference " ' "may not be

14

based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work." ' " (*People v. Davis* (2013) 57 Cal.4th 353, 360.) After a careful consideration of the record, we conclude that at the evidentiary hearing the prosecution failed to present evidence sufficient to support an inference of Williams's specific intent to kill. The trial court therefore erred by denying Williams's petition for resentencing under section 1172.6.

### III.   DISPOSITION

The order denying Williams's section 1172.6 petition is reversed and the matter is remanded to the trial court with directions to vacate Williams's attempted murder conviction and to resentence him in accordance with section 1172.6, subdivision (e).

_____
LIE, J.

WE CONCUR:



_____
GROVER, ACTING P.J.




_____
BROMBERG, J.





*People v. Williams*
H050558